**BELL ATLANTIC—DELAWARE, INC., Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF the STATE of Delaware, Appellee.**

Civil Action No. 96A–07–003.

Superior Court of Delaware, Kent County.

Submitted: Jan. 17, 1997.
Decided: April 4, 1997.

**602**

William E. Manning, and Bonnie L. Wolfgang, Duane, Morris & Heckscher, Wilmington, for Appellant.

P. Clarkson Collins, Jr., and Barbara MacDonald, Morris, James, Hitchens & Williams, Wilmington, for Appellee.

Patricia A. Stowell, Public Advocate, Wilmington.

## OPINION

TERRY, Resident Judge.

### Background

Bell Atlantic—Delaware, Inc., which I will refer to as "BA–Del" filed a proposed tariff with the Public Service Commission ("PSC") for a new service known as Residential IntellilineQ BRI which is also called Residential Integrated Services Digital Network, abbreviated R–ISDN. Without going into the technical aspects of this service, suffice it to say that the process digitizes signals so that a residential user can have much quicker response time when operating personal computers over the telephone line than is available when using the regular telephone service.

Eventually the tariff or rates proposed by BA–Del were subjected to a hearing before a hearing examiner who reduced them significantly. The hearing examiner's findings and recommendations were adopted by the Public Service Commission. The result was a much lower tariff then was sought by BA–Del and so BA–Del appealed to the Superior Court. The issue on appeal is whether BA–Del was denied due process of law by the PSC and whether the rates set in place by the PSC are supported by the evidence.

Before the issues are discussed, it is necessary to focus on the requirements of the Telecommunications Technology Investment Act (TTIA) which is found at 26 *Del. C.* § 701 to 711 and which provides the framework for this proceeding.

The TTIA was enacted in 1992 for the purpose of regulating the kind of service (among others) which BA–Del is providing in this case. Whenever a telecommunications service provider proposes to offer a new service, it has to comply with the TTIA. The R–ISDN service proposed here is classified as a basic service within the definition of that term as found in the TTIA. Section 706(a)(1) of the act provides that one who wishes to offer such a service must give notice to the PSC not less than sixty days prior to the proposed implementation date. The notice must also provide the PSC with information sufficient to demonstrate that the service is correctly classified as basic and the proposed rates are just and reasonable.

At 706(b) the statute goes on to provide that:

> The Commission may extend the proposed implementation date for any new service for good cause shown; provided, however, that notwithstanding such extension, the service provider may offer its new service as described and classified in its original filing unless the Commission shall have, by final order entered within 90 days of such original filing, established a classification or, in the case of a basic or discretionary service, rate other than that proposed by the service provider.

This Section means that the PSC can investigate the application and in effect extend the proposed implementation date by thirty days. However, unless the PSC issues a final order within ninety days from the filing date changing the rates, the service provider is free to offer the service at its proposed rate at the end of sixty days or ninety days if

the PSC extends the proposed implementation date by thirty days.

Once the rate is set pursuant to the provisions of § 706 it can only be changed or adjusted in the future pursuant to § 707. That section at subdivision (b) provides that once a year the rates for a basic service may be adjusted pursuant to an inflation based formula which reads:

Change in Rate = Change in Gross Domestic Product–Price Inflater since last rate change minus 3%

Other than changes determined by that formula, the statute at § 707(c) only allows six other exceptions which would result in subsequent rate changes. The first two exceptions authorize a service provider to elect not to implement a rate increase or a rate decrease otherwise required by the inflation formula. The third provides that no rate decrease resulting from the inflation formula can result in a rate lower than the incremental cost of providing the basic service. The fourth provides that the PSC may approve adjustments to the rates for a basic service where the overall result is to neither increase or decrease the total revenue derived from the basic service; in other words, revenue neutral adjustments. The fifth exception deals with adjustment of rates in connection with the purchase of the basic service by another service provider. And the sixth exception allows the PSC to approve a rate change "in order to reflect an unforeseen change in the service provider's costs of providing telecommunications service, which change occurs for reasons beyond the control of the applicable service provider." This type of situation is referred to as an exogenous cost.

In the case at bar BA–Del filed its proposed rates for R–ISDN on September November 4. The rate schedule was as follows:

1. A one time connection charge of $125.

2. A monthly recurring charge of $19.50.

3. A usage rate for data transmission of $0.02 per minute per data channel (peak time) and $0.01 (off peak time).

4. A usage rate for voice transmission of $0.03 for the first three minutes of use and $0.005 for each additional minute thereafter.

During the interval the Public Advocate filed a notice of intervention and both she and the PSC staff expressed concern about whether the. proposed rates were just and reasonable; they felt that a thorough analysis had to be undertaken. BA–Del was anxious to implement the service on November 4, 1995 because it was in the process of advertising for a pre-thanksgiving offering of R–ISDN. Both sides recognized that the proposed rates would go into effect on November 4, unless the PSC extended the period for an additional thirty days. The result was an agreement where the parties stipulated that the service could be provided at the proposed rates on November 4, 1995 but that a hearing examiner would be appointed to make findings and recommendations on the proposed rates. The parties agreed and the PSC ordered that the proposed rates would go into effect on November 4 "subject to the Commission's authority to order implementation of such rates and tariff terms and conditions as it shall determine to be just and reasonable, on a prospective basis, thereafter."

The parties obviously recognized that it was impracticable to analyze the filing and conduct a hearing within the first sixty days and, recognizing that BA–Del had a legitimate concern with implementing the service by the end of sixty days, they fashioned a device to avoid the imposition of a permanent rate which they thought would have otherwise occurred under § 706(b) absent a thirty day extension or a PSC order revising the rates. In doing this, I am satisfied it was everyone's intent to treat the rates filed September 5 (which I will call the "September rates") as interim subject to final order of the PSC at a later date. The agreement which put this scheme into place also provided that if the PSC were to eventually revise the rates, any changes would be on a prospective, not a retroactive basis. In fact the TTIA does not provide a mechanism where a public utility can put a rate into effect under bond as it can in other cases pursuant to 26 *Del. C.* § 306. In those other instances, any excess revenue derived from an interim rate

over the rate ultimately set by the PSC would be refunded to the consumer. At this point the PSC order had in effect set the September rates as interim and referred the matter to a hearing officer for an evidentiary hearing.

A pre-hearing conference and correspondence followed which dealt with an attempt to frame the issues and adopt a schedule for the hearings. The questions raised about the September rates were whether the connection charge and the monthly charge were too high and whether there should be a flat rate instead of a usage rate. The PSC staff and the Public Advocate were inclined to favor a flat monthly rate for the service rather than charging per minute of usage. BA–Del said it was working on a flat rate discounted package but that since this is a new service being put in place nationwide it would need twelve months of market and experience studies to produce one.

The proceedings were to include some public hearings and then an evidentiary hearing. Public hearings were held in January and February 1996, and in February BA–Del informed the parties that it was undertaking cost data and rate design studies and expected to produce a new rate structure proposal in March 1996. The hearing officer, PSC staff and the Public Advocate all seemed to agree with BA–Del that the proceedings should be suspended in order to give BA–Del time to submit a new proposal at which time the evidentiary hearing would be held on the new rate schedule. However, as a condition of such a suspension BA–Del was asked to either stop offering R–ISDN to new customers during the suspension period or agree to refund any excess revenues collected from customers from the date of suspension over the eventual rate to be set by the PSC. The correspondence in this respect indicates that at least the PSC staff contemplated that once the new rate schedule was filed, extended further proceedings would be required.

However, BA–Del refused to voluntarily stop offering R–ISDN to new customers or agree to refund any excess revenue collected during the period of suspension, so the hearing examiner decided to go ahead with an evidentiary hearing on the September rates.

A notice of hearing was published which clearly stated that the hearing would be held on the rate schedule submitted on September 5, 1995 and that the hearing date was set for April 19, 1996.

BA-Del filed its new rates with the PSC on April 17, 1996 which I will refer to as the "April rates." This package provided for incremental flat rates based on hours of use; up to 20 hours monthly would be charged at $31.00, up to 60 hours at $45; up to 140 hours at $60.00; up to 300 hours at $90.00; up to 500 hours at $120; and unlimited $249.00. The Commission set up a separate docket for this filing.

When the hearing was held on April 19, the scope was limited to the September 5 rate schedule and no evidence on the April rates was allowed. The parties agreed that the April rates should not be tested at this hearing because they were recently filed and there was insufficient background information.

As a result of the April 19 hearing, the hearing examiner recommended that the PSC set a monthly rate of $12.92, a flat monthly usage charge of $1.60 and a connection charge of no more than $35.90.

The PSC held its own hearing on June 4, 1996 at which time BA–Del's representatives told it that they thought that consideration of the April rates would be saved for another hearing by the hearing examiner. Therefore they asked the PSC to remand the case back to the hearing examiner for the purpose of holding an expanded evidentiary hearing to include the April rates. The PSC recognized the wide disparity between BA–Del's proposed rates and those recommended by the hearing examiner and suspended the docket for two weeks to give the parties time to negotiate. The PSC was clearly concerned with the wide disparity between the rates recommended by the hearing examiner and those which BA–Del contended were just and reasonable. Some of the members expressed concern that given the wide gap between the two sides and the uncertainty about who was right, if they missed the mark in setting the rates the result could end up as being a big mistake. The staff told the PSC that if it

were to set the rates there was significant uncertainty as to whether they could be corrected in the future if experience revealed that a mistake had been made. It was thought that it would be difficult to bring this type of situation within the exceptions found at § 707(c) particularly that dealing with exogenous costs which seemed to be the only exception that was possibly applicable. Therefore, everyone was aware of the fact that the establishment of unreasonably low rates would likely have permanent adverse consequences to BA–Del.

However, negotiations failed and the PSC held another hearing on June 18 at which it elected not to remand the matter to the hearing examiner but rather to adopt his recommendations. The PSC also issued an order disallowing the April rate application which was the subject of a separate docket.

BA-Del appealed to this Court from both PSC orders. I ordered a stay of the PSC order imposing a specific rate schedule pending this appeal on the condition that any excess revenue which BA–Del might collect in the interim over those rates to be finally established would be refunded to the consumers. On appeal, the Superior Court has the authority to impose such a condition pursuant to 29 *Del. C.* § 10144 and 26 *Del. C.* § 511. I later issued another order allowing BA–Del to put the lower April rates into effect pending this appeal instead of the higher September rates.

### *Discussion*

 "In the exercise of quasi-judicial or adjudicatory administrative power, administrative hearings, like judicial proceedings, are governed by fundamental requirements of fairness which are the essence of due process, including fair notice of the scope of the proceedings and adherence of the agency to the stated scope of the proceedings." *Carousel Studio v. Unemployment Ins. Appeal Bd.*, Del.Super., C.A. No. 89A–AU–7, Babiarz, J., 1990 WL 91108 (June 26, 1990). "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). "Due process as it relates to the requisite characteristics of the proceedings entails providing the parties to the proceeding with the opportunity to be heard, by presenting testimony or otherwise, and the right of controverting, by proof, every material fact which bears on the question of right in the matter involved in an orderly proceeding appropriate to the nature of the hearing and adapted to meet its ends." *Carousel Studio,* at 3–4 (*Citing* 2 *Am.Jur.* Administrative Law § 353). Further, "due process requires that the notice inform the party of the time, place, and date of the hearing and the subject matter of the proceedings." *J.L.B. Corp. v. Delaware A.B.C.C.,* Del.Super., C.A. No. 83A–NO–13, at 4, Ridgely, J., 1985 WL 189008 (June 7, 1985). More specifically, due process requirements "are satisfied if the party proceeded against understood the issue and was afforded a full opportunity to justify its conduct." *Id. see In Re Gresick,* Del.Super., C.A. No. 87A–MR–16, at 17, Gebelein, J., 1988 WL 116411 (Nov. 2, 1988). The Delaware Administrative Procedures Act requires a formal, public evidentiary hearing in cases that involve rate making. 29 *Del. C.* § 10124. The Administrative Procedures Act creates a right to a hearing and provides that the notice shall describe the subject matter of the proceedings. 29 *Del. C.* § 10122(1). In speaking of due process, the United States Supreme Court observed that:

The phrase expresses that requirement of "fundamental fairness," a requirement whose meaning can be as opaque as *its* importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake. *Lassiter v. Department of Social Services,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981).

This is a case of first impression since the TTIA is a recent statute and the BA–Del R–ISDN application is for a new basic service in Delaware. It is obvious from a review of the

record that BA–Del and other telephone companies nationwide are in the process of putting a new basic service into effect. There is considerable controversy ever what rates are just and reasonable for R–ISDN and because of limited experience in providing the service much of the cost and revenue studies are in a developing process. When the September rates were filed BA–Del was anxious to put the service into effect and thus the parties agreed to make those rates temporary pending prospective changes after an evidentiary hearing.

Early in 1996 when the public hearings on the September rates were in progress, it became apparent that one of the major controversies was over whether the rates should be based on usage or whether they should be flat. BA–Del set about to develop a new package which would encompass a flat rate method. The proceedings on the September rates would have been suspended pending the filing of the new rate package, which was expected to occur in March, except for the inability of the parties to agree on conditions. The PSC staff and the Public Advocate did not want to delay its evidentiary hearing on the September rates which they thought were too high, and I believe that in view of the expected filing of a new rate package in March, the parties contemplated another hearing after that happened. The new rate package was actually filed April 17, two days before the hearing on the September rates. BA–Del was, I believe, under the reasonable expectation that if the September rates were adjusted, it would still result in a temporary rate pending a hearing on the April rates. Thus, BA–Del did not seek, nor did the hearing examiner permit, any evidence on the April rate application at the hearing on the September rates. Therefore, BA–Del had no opportunity to defend its April rates at the hearing.

The hearing examiner set a rate substantially lower than both the September rates and the April rates. That being the case, the PSC and Public Advocate say that another hearing on the April rates would be futile because the hearing examiner has already determined that a just and reasonable rate is lower than the April rates.

BA-Del's point is that it put on evidence to defend only its September rates which were based on minute usage. At a hearing on the April rates, which are flat rates, BA–Del says it will introduce evidence regarding flat rate usage assumptions which were not relevant to its minute measured September rates. BA–Del wants to develop a record on usage and costs as they pertain to a flat rate structure. At any rate, BA–Del has not been given the opportunity to defend its April rates.

When the Commission took the matter up at a hearing on June 4, the case was in this posture. BA–Del had filed two applications: the September rates and the April rates. The PSC had created a docket for each application. An evidentiary hearing had been held on the September rates by the hearing examiner who had filed his findings and recommendations with the PSC. Sixty days were about to expire from the time of the filing of the April rates which were carried under a second docket. No final rate had been set by the PSC.

At the June 4 hearing BA–Del asked the Commission to remand the case back to the hearing examiner so that an evidentiary hearing could be expanded to include the April filing. It was anticipated that all of this could be accomplished by August.

The Commission refused to remand the case to the hearing examiner and instead entered an order suspending the April filing so that the April rates would not take effect at the expiration of the sixty days. It set a new hearing date for June 18 and ordered the parties to negotiate and attempt to arrive at a settlement in the meantime. The Commission was aware that once it set a rate it would likely be a permanent rate subject to change only under the limited circumstances which I have already noted. When settlement negotiations proved unsuccessful, the PSC adopted the September rates at the June 18 meeting.

It is in the context of these facts that I must determine whether BA–Del was denied due process. In doing so I take note of the fact that BA–Del has a significant interest in not being permanently saddled with a rate

which will result in an operating loss for the service provided. I also recognize the fact that there is a strong public interest in securing this new service at a just and reasonable charge.

The R–ISDN service is new and at the time this appeal was filed there were relatively few subscribers thus distinguishing it from other services such as ordinary telephone service where there are thousands of customers. I find that at this stage of the development of R–ISDN the most important interest to be protected for all parties is the establishment of a rate that is just and reasonable. In order to accomplish that goal it goes without saying that Ba–Del should have the opportunity to put into the record all relevant evidence on that subject.

The result of the Commission's action in respect to the two dockets was to establish the September rates and to reject the April rates. This action was taken on the recommendations of the hearing examiner resulting from the evidentiary hearing which was advertised and agreed by the parties to be restricted to the September rates only. BA–Del had no notice that the April rate filing would be adjudicated as a result of that hearing and reasonably believed that any rates set as a result of that hearing would be a continuation of the interim rates pending a future hearing on the April rates.

I realize that the staff and Public Advocate say that this situation arose primarily because of BA–Del's unreasonableness in refusing to agree to the conditions which were proposed in connection with a stay of the proceedings before the hearing examiner and because of BA–Del's failure to realize that the hearing held by the hearing examiner would result in the imposition of permanent rates and thereby foreclose the possibility of revisiting the April rate application at a later time.

There is no doubt that this controversy could have been avoided if BA–Del had agreed to refund any excess revenues as a condition of staying the matter before the hearing examiner. But my review of the record also convinces me that BA–Del had a reason to believe that there would be a second hearing on the April rates.

■ Considering the potentially substantial adverse consequences to BA–Del if the rates were to be set too low and considering the fact that the R–ISDN service is new and the costs and revenues under varying rate structures are not fairly established by experience, I find that BA–Del was denied fundamental fairness in the proceedings.

BA-Del was not given an opportunity to defend its April rates at the evidentiary hearing or notice that they would be foreclosed from defending those rates at a subsequent hearing. Since no final rate had been set at the time the April rates had been filed and since the parties had already agreed to make the September rates temporary, thereby creating a special circumstance for this application which was not expressly provided for in the statute, I see no compelling reason why BA–Del was not given the opportunity to defend and make a record on its April rates since this would only have caused a delay of a few months. This observation is especially compelling in view of the fact that the consequences of rushing to set a permanent rate, which might ultimately turn out to be unreasonably low, would have serious consequences for BA–Del since such a mistake might be incapable of correction.

In balancing the interests at stake in this matter it is obvious that if the rate is so low that BA–Del will lose money by providing R–ISDN, its interests are seriously impaired. But such a result also works to the detriment of the other parties, the consumers. If the rate is so low that BA–Del loses money, what incentive does it have to promote and market R–ISDN or to invest money to improve the service? The only way to feel confident that a just and reasonable rate is set is to afford BA–Del the opportunity to put on all of the evidence which is relevant to the issue.

In view of the fact that the PSC was dealing with a new technology where costs and revenue projections were hotly debated and in further view of the fact that a mistake would lead to long term adverse consequences, I find that the dismissal of the April rate application without a full hearing deprived BA–Del of due process of law. The matter is remanded to the PSC with instruc-

tions to afford BA–Del a hearing on the April rate filing.

In light of this conclusion, it not necessary for me to reach the question of whether the rate decision is supported by substantial evidence.